Mark L. Javitch (CA SBN 323729)
Javitch Law Office
3 East 3rd Ave Ste. 200
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
mark@javitchlawoffice.com

*Attorney for Plaintiff
and the Putative Classes*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| DANIEL K. SUIHKONEN, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br>   v.<br><br>POKERGO LLC, a Delaware limited liability company,<br>              Defendant. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT** |

## CLASS ACTION COMPLAINT

Plaintiff Daniel K. Suihkonen, on behalf of himself and all others similarly situated, files this Class Action Complaint against PokerGo LLC ("PokerGo" or "Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), and the California Automatic Renewal Law, Cal. Bus. & Prof. Code, § 17600, through its website, *PokerGo.com*. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I. NATURE OF THE ACTION

1. This is a consumer digital privacy class action complaint against PokerGo LLC, which operates *PokerGo.com*, for its practice that violates VPPA by knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing its digital subscribers' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing the prerecorded video, and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information") without obtaining proper consent.

2. Defendant also enrolls consumers in automatic renewal membership programs without providing the "clear and conspicuous" disclosures mandated by California law, and posts charges to consumers' credit or debit cards for purported membership charges without first obtaining the consumers' affirmative consent to an agreement containing the requisite clear and conspicuous disclosures. This course of

conduct violates the California Automatic Renewal Law (Bus. & Prof. Code, § 17600 et seq.) ("ARL").

3.    VPPA prohibits "video tape service providers," such as *PokerGo.com* from knowingly disclosing consumers' "personally identifiable information," which "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without first obtaining express consent in a stand-alone consent form. 18 U.S.C. § 2710(a)(3), (b).

4.    Defendant collects and shares the personal information of visitors to its website with third parties. Defendant does this through cookies, software development kits ("SDK"), and pixels. In other words, digital subscribers to *PokerGo.com* have their personal information disclosed to Defendant's third-party business partners.

5.    The Facebook pixel is a code Defendant installed on its *PokerGo.com* website allowing it to collect users' data. More specifically, it tracks when digital subscribers enter *PokerGo.com* and view Video Media, Defendant's Poker Videos. Defendant's websites track and disclose to Facebook the digital subscribers' viewed Video Media, and most notably, the digital subscribers' FID. This occurs even when the digital subscriber has not shared (nor consented to share) such information.

6.    Importantly, Defendant shares the Personal Viewing Information—i.e., digital subscribers' unique FID and Video Media viewed—*together as one data point to Facebook*. Because the digital subscriber's FID uniquely identifies an individual's

Facebook user account (containing, among other things, their real name, photograph, and other personally identifying information), Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view digital subscribers' corresponding Facebook profile. Put simply, Facebook pixel grants Facebook knowledge of the Video Media each of its subscribers view on the *PokerGo.com*.

7.    Defendant uses the Personal Viewing Information to build more targeted advertising on its website which, in turn, generates greater revenue. Thus, without obtaining consent from its digital subscribers, Defendant profits from its unauthorized disclosure of its digital subscribers' Personal Viewing Information to Facebook. Defendant reaps these secret profits at the expense of its digital subscribers' privacy and their statutory rights under VPPA.

8.    Because Defendant does not inform *PokerGo.com* digital subscribers about this dissemination of their Personal Viewing Information—indeed, it is automatic and *invisible*—they cannot exercise reasonable judgment to defend themselves against the highly personal ways *PokerGo.com* has used and continues to make money by using their personal data.

9.    At the same time, Defendant failed to adhere to obligations under California's Auto-Renewal Law ("ARL"). The ARL seeks to ensure that, before there can be a legally-binding automatic  renewal or continuous service arrangement, there must first be clear and conspicuous disclosure of  certain terms and conditions and affirmative consent by the

consumer.   To that end, § 17602(a)  makes it unlawful for any business making an automatic renewal offer or a continuous service offer to a consumer in California to "Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer."  For this purpose, "clear and conspicuous" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." (§ 17601(c).)  The statute defines "automatic renewal offer terms" to mean the "clear and conspicuous" disclosure of the following: (1) that the subscription or purchasing agreement will continue until the consumer cancels; (2) the description of the cancellation policy that applies to the offer; (3) the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known; (4) the length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer; and (5) the minimum purchase obligation, if any.  (Bus. & Prof. Code § 17601(b).)

10.    Defendant chose to disregard Plaintiff's and hundreds of thousands of other *PokerGo.com* digital subscribers' statutorily protected privacy rights by releasing their

sensitive personal data to Facebook and not giving the proper notifications due to Plaintiff and the putative classes. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA, and to adhere to California's Autorenewal Law.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

12.    This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

13.    This Court also has supplemental jurisdiction over Plaintiff's related state law causes of action.

14.    Venue is appropriate in this District pursuant to 28 U.S.C. §1391(b)(2) because Defendant caused the injury to Plaintiff in this District.

## III.    PARTIES

15.    Plaintiff Daniel K. Suihkonen is an adult citizen of California and is domiciled in El Segundo, California.

16.    Defendant is a Delaware limited liability company headquartered in Nevada. Defendant develops, owns, and operates the *PokerGo.com* website, which includes a broad selection of prerecorded video content of professional poker tournaments.

## IV.    FACTUAL ALLEGATIONS

### A.    Background of the Video Privacy Protection Act

17.    VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees. *Id.* at § 2710(c).

18.    VPPA was initially passed in 1988 to protect the privacy of individuals' and their families' video rental, purchase and viewing data. Prior to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

19.    Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information

COMPLAINT                                        7

generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

20.    In proposing the Video and Library Privacy Protection Act, later codified as VPPA, Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

21.    While these statements rang true in 1988 when VPPA was passed, the importance of legislation like VPPA in the modern era of data mining from online activities is even more pronounced. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today,

COMPLAINT                                8

social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

22.    In this case, Defendant chose to deprive Plaintiff and the Class members of that right by systematically disclosing their Personal Viewing Information to Facebook, without providing notice to (let alone obtaining consent from) anyone, as explained herein.

**B.    Background of California's Auto Renewal Law**

23.    In 2009, the California Legislature passed Senate Bill 340, which took effect on December 1, 2010 as Article 9 of Chapter 1 of the False Advertising Law.  (Bus. & Prof. Code, § 17600 et seq. (the California Automatic Renewal Law or "ARL").)  (Unless otherwise stated, all statutory references are to the Business & Professions Code).  SB 340 was introduced because:  "It has become increasingly common for consumers to complain about unwanted charges on their credit cards for products or services that the consumer did not  explicitly request or know they were agreeing to. Consumers report they believed they were making a one-time purchase of a product, only to receive continued shipments of the product and charges on their credit card. These unforeseen charges are often the result of agreements enumerated in the 'fine print' on an order or advertisement that the consumer responded to."

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury  (last accessed March 15, 2022).

24. The ARL seeks to ensure that, before there can be a legally-binding automatic renewal or continuous service arrangement, there must first be clear and conspicuous disclosure of certain terms and conditions and affirmative consent by the consumer.

25. The statute defines "automatic renewal offer terms" to mean the "clear and conspicuous" disclosure of the following: (1) that the subscription or purchasing agreement will continue until the consumer cancels; (2) the description of the cancellation policy that applies to the offer; (3) the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known; (4) the length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer; and (5) the minimum purchase obligation, if any. (Bus. & Prof. Code § 17601(b).) For this purpose, "clear and conspicuous" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." (§ 17601(c).)

26. To that end, § 17602(a) makes it unlawful for any business making an automatic renewal offer or a continuous service offer to a consumer in California to do any of the following:

a. Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer.

b. Charge the consumer's credit or debit card or the consumer's account with a third party for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing clear and conspicuous disclosure of the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time. (Bus. & Prof. Code § 17602(a)(2).)

c. Fail to provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. (Bus. & Prof. Code, § 17602(a)(3).) Section 17602(b) requires that the acknowledgment specified in § 17602(a)(3) include a toll-free telephone number, electronic mail address, or another "cost-effective, timely, and easy-to-use" mechanism for cancellation.

27. If a business sends any goods, wares, merchandise, or products to a consumer under a purported automatic renewal or continuous service arrangement without first obtaining the consumer's affirmative consent to an agreement containing the "clear and conspicuous" disclosures as specified in the ARL, the goods, wares, merchandise, and/or products are deemed to be an unconditional gift to the consumer, who may use or dispose of them without any obligation hatsoever. (Bus. & Prof. Code, § 17603.) Violation of the ARL gives rise to restitution and injunctive relief under the general remedies provision of the False Advertising Law, Bus. & Prof., Code § 17535.

(Bus. & Prof. Code, § 17604(a).)  Also, violation of the ARL gives rise to restitution and injunctive relief under the UCL.

## C.    *PokerGo.com* **Digital Subscriptions**

28.    Defendant owns and operates a website that provides a wide range of professional poker tournaments through prerecorded videos.

29.    To register for *PokerGo.com*, users like Plaintiff provide their personal information, including but not limited to their email address and physical address.

30.    *PokerGo.com* subscribers like Plaintiff implicitly provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, which informs Defendant as to subscribers' city, zip code and physical location.

31.    Subscribers to *PokerGo.com* may provide to Defendant the identifier on their devices and/or cookies stored on their devices.

32.    When opening a *PokerGo.com* account, Defendant does not disclose to its subscribers that it will share their Personal Viewing Information with third parties, such as Facebook. Subscribers are also not asked to consent to such information sharing upon opening an account.

33.    After becoming a subscriber, viewers have access to a variety of prerecorded Video Media on Defendant's digital platforms.

COMPLAINT                                    12

34.    Notably, once a digital subscriber like Plaintiff signs in and watches Video Media, the digital subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

## D.    How PokerGo.com Disseminates Digital Subscribers' Personal Viewing Information

### 1.    Tracking Pixels

35.    Websites and apps use Facebook's pixel and SDK to collect information about user's devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

36.    The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is an *invisible* tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website advertiser tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

37.    Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it

benefits financially from the advertising and information services that stem from use of the pixel. The pixel allows Facebook to build detailed profiles about a website's users as those users browse the Internet to enable advertisers to serve them with targeted advertisements.

38.    When a PokerGo.com digital subscriber enters the website and watches Video Media on the website, the website sends to Facebook certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, *PokerGo.com* sends to Facebook that a video is being watched on *PokerGo.com*, its URL, and, most notably, the viewers' Facebook ID.

### 2.    Facebook ID ("FID")

39.    An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone ordinary person can look up the user's Facebook profile and name.[2] When a Facebook user with one or more personally identifiable FID cookies on his or her browser views Video Media from *PokerGo.com*, through their website code, *PokerGo.com* causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into *PokerGo.com's* website.

---

[2] Facebook's Real Name Policy requires users to use their authentic name—the name they go by in daily life—on their profiles. The policy is intended to ensure users know who they are connecting with, promote accountability, and reduce anonymous abuse.

40.    Defendant could easily program its website to prevent its users' Personal Viewing Information from being automatically transmitted to Facebook when a subscriber views Video Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

41.    Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary people who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person can learn the identity of the digital subscriber and that they are watching videos on the PokerGo.com website. In other words, by obtaining a person's FID, any third-party can discover that that person watched a certain kind of video on Defendant's website, which is exactly the type of personally identifiable information that VPPA is intended to protect from unauthorized disclosure.

42.    At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled *PokerGo.com* website to show targeted advertising to its digital subscriber's based on the products those digital

COMPLAINT                                    15                    _____

subscriber's had previously viewed on the websites or Apps, including Video Media purchases, for which Defendant received financial remuneration.

**E.    *PokerGo.com* Unlawfully Disclose Their Digital Subscribers' Personal Viewing Information to Facebook**

43.    Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

44.    Defendant is not sharing anonymized, non-personally identifiable data with Facebook, as it represents. On the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information—Facebook—*receives the Personal Viewing Information as one data point*. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

45.    Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

46.    As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

47.    Defendant does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

48.    By disclosing its digital subscribers Personal Viewing Information to Facebook—which undeniably reveals their identity and the specific video materials they requested from Defendant's websites, Defendant has intentionally and knowingly violated VPPA.

**F.    Defendant Does Not Need to Disclose Personal Viewing Information to Operate its Website**

49.    Tracking pixels are not necessary for Defendant to operate *PokerGo.com's* digital publication and sign-up digital subscriptions. They are deployed on Defendant's websites and Apps for the sole purpose of enriching Defendant and Facebook.

50.    Even if an on-line publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing Information to Facebook. In any event, if Defendant wanted to do so, it must first comply with the strict requirements

COMPLAINT                                    17

of VPPA, which it failed to do. As noted above, even Facebook forbids the disclosure of such information without first complying specifically with VPPA (and relevant state laws).

**G.    Plaintiff Did Not Receive the Notices Required Under the VPPA and the ARL**

51.    Plaintiff Suihkonen has been a digital subscriber of *PokerGo.com* from approximately July 2023 to the present. Plaintiff became a digital subscriber by providing, among other information, his name, address, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. As part of his subscription, he receives emails and other digital content from *PokerGo.com*.

52.    In or about July 2023, Plaintiff went on the PokerGo.com website. Plaintiff decided to sign up for one year to be able to watch professional poker videos.

53.    Defendant did not present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity.

54.    When Plaintiff entered his credit card details, Plaintiff believed that after the year period, his credit card would not be charged. However, on or around July 2024, Defendant posted a charge to Plaintiff's credit card.

55.    If Plaintiff had known that Defendant was going to enroll him in an automatically renewing program that would result in additional charges being posted to his credit card, Plaintiff either would not have submitted his credit card information to

Defendant or would have cancelled so as to avoid any charges to his credit card during or after July 2024.

56.     Plaintiff did not consent or otherwise receive notice of Defendant's intent to charge his credit card prior to the charge.

57.     Plaintiff Suihkonen has had a Facebook account since before he signed up for *PokerGo.com*. From 2023 to the present, Plaintiff requested, obtained, and viewed prerecorded Video Media via *PokerGo.com's* website, and through the use of the Pixel, Defendant knowingly transmitted his Personal Viewing Information concerning the prerecorded videos he watched to Facebook, allowing Facebook to connect Plaintiff's identity to *PokerGo.com's* platform.

58.     Plaintiff Suihkonen never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

59.     Because Plaintiff is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff the full set of benefits to which he was entitled as part of being a *PokerGo.com* digital subscriber.

COMPLAINT                                    19

# V.    CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action on behalf of themselves, and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> VPPA Class. All persons in the United States with a digital subscription to *PokerGo.com* who had their Personal Viewing Information disclosed to Facebook by Defendant.

> ARL Class. All individuals in California who were (1) enrolled in a PokerGo.com membership program and (2) charged for renewal after the first year within the applicable statute of limitations.

> Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

61.    <u>Numerosity</u>. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Upon information and belief, hundreds of thousands of members of the Class are widely dispersed throughout the United States. Class members can be readily identified from Defendant's records and non-party Facebook's records.

62.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by

Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without Plaintiff or Class members obtaining express written consent. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

63.   Adequacy. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

64.   Commonality. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a)   Whether Defendant provided the requisite notices to comply with the ARL;

(b)   Whether Defendant's notices were clear and conspicuous;

(c)   Whether Defendant obtained affirmative consent from Plaintiff and the ARL class;

(d)   Whether Defendant knowingly disclosed VPPA Class members' Personal Viewing Information to Facebook;

COMPLAINT                                21

(e)    Whether the information disclosed to Facebook concerning VPPA Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(f)    Whether Defendant's disclosure of VPPA Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(g)    Whether VPPA Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(h)    Whether the Classes are entitled to damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred, and other preliminary and equitable relief as the court determines to be appropriate, as a result of Defendant's conduct.

65.    <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no

special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**
**On behalf of the VPPA Class**

66.    Plaintiff incorporates the foregoing paragraphs by reference as if fully set forth herein.

67.    VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

68.    As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

69.    Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

70.     As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

71.     Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed *PokerGo.com* Video Media, including the specific prerecorded video materials requested from the website.

72.     As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to a digital *PokerGo.com* plan that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

73.     As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

COMPLAINT                                24

74.    In addition, VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by VPPA.

75.    Defendant knew that these disclosures identified Plaintiff and Class members to Facebook. Defendant also knew that Plaintiff's and Class members' Personal Viewing Information was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

76.    By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

77.    As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## SECOND CLAIM FOR RELIEF
### False Advertising based on the California Automatic Renewal Law
### On behalf of the ARL Class

78.    Plaintiff incorporates the previous allegations as though fully set forth herein.

79.    Plaintiff is informed and believes and thereon alleges that, during the applicable statute of limitations period, Defendant has enrolled consumers, including Plaintiff and Class members, in an automatic renewal program or continuous service program and have violated the ARL by, among other things, (a) failing to present automatic renewal offer terms in a clear and conspicuous manner before a subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to a request for consent to the offer; (b) charging the consumer's credit card, debit card, or third-party payment account for an automatic renewal without first obtaining the consumer's affirmative consent to an agreement containing clear and conspicuous disclosure of all automatic renewal offer terms; and (c) failing to provide an acknowledgment that includes clear and conspicuous disclosure of all automatic renewal offer terms, the cancellation policy, and information regarding a mechanism for cancellation that is cost-effective, timely, and easy to use, all in violation of § 17602(a) and (b).

80.    Plaintiff has suffered injury in fact and lost money as a result of Defendant's violations of the ARL.

81.    Pursuant to Bus. & Prof. Code § 17535, Plaintiff and Class members are entitled to restitution of all amounts that Defendant charged to Plaintiff's and Class

members' credit cards, debit cards, or third-party payment accounts in connection with an automatic renewal membership program during the four years preceding the filing of this Complaint and continuing until Defendant's statutory violations cease.

82.    Unless enjoined and restrained by this Court, Defendant will continue to commit the violations alleged herein. Pursuant to § 17535, on behalf of the Class and for the benefit of the general public of the State of California, Plaintiff seeks an injunction prohibiting Defendant from continuing its unlawful practices as alleged herein.

## VII.    RELIEF REQUESTED

83.    Accordingly, Plaintiff, on behalf of themselves and the proposed Classes, respectfully requests that this Court:

(a)    Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare Plaintiff as the representatives of the Classes and his counsel as Class Counsel;

(b)    Declare that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)    Declare that Defendant's conduct as described herein violates the California Autorenewal and False Advertising Laws § 17600 et seq. and § 17535;

(d)    Order Defendant to pay $2,500.00 to each Plaintiff and to each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

COMPLAINT                    27

(e)    Order Defendant to pay punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(f)    Order Defendant to pay restitution under Cal. Bus. & Prof. Code §§ 17353, 17203 and any other form of monetary equitable relief;

(g)    Order Defendant to pay prejudgment interest on all amounts awarded;

(h)    Provide for injunctive relief as pleaded or as the Court may deem proper; and

(i)    Enter an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C) and/or Code of Civil Procedure § 1021.5.

## VIII.  JURY DEMAND

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b) and Civil L.R. 38-1, Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: February 18, 2025        Respectfully submitted,


By: /s/ Mark L. Javitch
Mark L. Javitch (California SBN 323729)
3 East Third Ave. Ste. 200
San Mateo CA 94401
Tel: (650) 781-8000
Fax: (650) 648-0705

Attorney for Plaintiff
*and the Putative Classes*

COMPLAINT                    28